# EXHIBIT 1

Michael J. Manning, Jr., Esq. (State Bar No. 286879)
**MANNING LAW, APC**
26100 Towne Centre Drive
Foothill Ranch, CA 92610
Office: (949) 200-8755
Fax: (866) 843-8308
AccessPrivacy@manninglawoffice.com

Jarrett Charo, Esq. (State Bar No. 224001)
**Jarrett Charo, APC**
4079 Governor Dr., No. 1018
San Diego, California 92122
P: (619) 350-3334
jcharo@charolaw.com

Attorneys for Plaintiff
Ramy Eden

**SUPERIOR COURT OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN DIEGO**

Ramy Eden, an individual,

Plaintiff,

v.

Big Agnes, Inc., a Colorado corporation; and DOES 1-10, inclusive,

Defendants.

Case No.:

**Complaint For Damages and Declaratory and Injunctive Relief For:**

1. **Violations of California Invasion of Privacy Act;**
2. **Violation of California Unauthorized Access to Computer Data Act;**
3. **Violation of California's Unfair Competition Law**

**Jury Trial Demanded**

Plaintiff Ramy Eden ("Plaintiff") brings this action against defendant Big Agnes, Inc., a Colorado corporation ("Defendant") and alleges the following upon information and belief based upon investigation of counsel, except as to Plaintiff's own acts, which Plaintiff alleges upon personal knowledge:

## INTRODUCTION

1. Defendant owns and operates the website https://www.bigagnes.com/. When visitors, including Plaintiff, visited this Website, Defendant surreptitiously installed pen registers and/or trap and trace devices on Plaintiff's internet browser without a court order and without Plaintiff's consent and wrongfully obtained Plaintiff's data for financial gain.

2. Defendant created its online presence at its website (hereinafter the "Website" or "Defendant's Website" (which shall refer to https://www.bigagnes.com/, and any other website operated by or controlled by Defendant as well as any third party content which is located on or used in connection with https://www.bigagnes.com/, for the purpose, *inter alia,* of communicating with potential customers and of providing information, discounts, and/or access to Defendant's goods and services.

**Defendant Uses Hidden Trackers on its Website to Obtain Plaintiff's User Data and Secretly Share it With Third Parties.**

3. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website to monitor user interactions. These trackers typically take the form of a small, invisible image (often 1x1 pixel in size) or a lightweight JavaScript snippet that executes when a user loads a webpage or completes an action.

4. When triggered, the pixel sends data—such as page views, session duration, referrer URLs, IP address, and browser details—from the user's browser to a third-party server. Pixel trackers are widely used in digital marketing and analytics to assess user engagement, measure campaign performance, and personalize advertising.

5. When users visit the Website, Defendant causes trackers to be embedded on the internet browsers of those who visit Defendant's Website. These trackers include, but are not limited to, the Shopify App Tracker and the Klaviyo Tracker.

6. The Shopify App Tracker and the Klaviyo Tracker, are referred to herein collectively as the "Trackers."

7. The third parties who operate the Trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies.

8. The Trackers are operated by third parties who are separate and distinct from Defendant—Shopify Inc. (in the case of the Shopify App Tracker) and Klaviyo, Inc. (in the case of the Klaviyo Tracker)—(collectively, the "Third Parties").

9. Defendant enables the Trackers, which cause the visitors' User Information to be transmitted to the Third Parties' servers. As detailed below, once the Third Parties obtain the visitors' User Information the Third Parties are able to uncover the identity of the visitors and monetize the visitors' data through targeted marketing and advertisement brokerages.

10. Through the Trackers, the Third Parties collect Website users' information such as IP addresses, device and browser type, screen resolution, operating system, pages visited, time spent on each page, scroll depth, mouse movements, clicks, referring URLs, unique identifiers (such as cookies and advertising IDs), geographic location based on IP address, user session duration, form interactions, and behavioral data used for profiling, ad targeting, cross-device identification, and/or real-time bidding (the "User Information"). Defendant and the Third Parties then use the User Information for hyper-targeted marketing and advertising and to generate revenue.

11. Because the Trackers capture users' IP addresses, which constitute "routing, addressing, or signaling information," the Trackers are a "pen register" and/or "trap and trace device" as defined by the California Invasion of Privacy Act ("CIPA"). *See* Cal. Penal Code § 638.50(b), (c); *see* also *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

12. Plaintiff did not consent to the Trackers being installed on Plaintiff's devices and did not expect disclosure and/or monetization of Plaintiff's information to Third Parties. By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51.

/ /

13. Plaintiff brings this action to prevent Defendant from violating the privacy rights of California residents and to recover statutory damages for Defendant's violation of CIPA section 638.51.

## JURISDICTION AND VENUE

14. Defendant conducted and continues to conduct substantial business in the State of California, County of San Diego, and Defendant's offending Website is available throughout California.

15. Defendant conducts substantial business in San Diego County.

16. A substantial portion of the conduct complained of herein occurred in this District.

## PARTIES

17. Plaintiff, at all times relevant and as alleged herein, is a resident of California, County of San Diego.

18. Plaintiff is informed and believes, and thereon alleges Defendant is a Colorado corporation, and has its principal place of business in Sacramento, California.

19. The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names.

20. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

21. At all relevant times as alleged herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and/or scope of said agency and/or employment with the full knowledge and consent of each of the Defendants.

22. Each of the acts and/or omissions complained of herein were alleged and made known to, and ratified by, each of the other Defendants (Defendant, together with any DOE Defendants, are collectively referred to hereinafter as "Defendant" or "Defendants").

/ /

/ /

## FACTUAL ALLEGATIONS

### Defendant Violated the California Invasion of Privacy Act (CIPA)

23. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Cal. Penal Code § 630).

24. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. (Cal. Penal Code § 638.51(a)).

25. A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication. (Cal. Penal Code § 638.50(b)).

26. Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents. (Cal. Penal Code § 638.50(b)).

27. In practical terms, a pen register records <u>outgoing</u> dialing information, while a trap and trace device records <u>incoming</u> dialing information.

28. Historically, law enforcement has utilized these devices to surreptitiously monitor telephone activity, with pen registers recording outgoing numbers dialed <u>from</u> a specific monitored line and trap and trace devices recording the telephone numbers of the callers who make incoming call numbers <u>to</u> that specific monitored line.

29. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register implanted on a user's device could surreptitiously

record the sender's email address, the recipient's email address, and the subject line of the email—essentially capturing the user's outgoing information.

30. Similarly, if the user receives an email, a trap and trace device could surreptitiously record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

31. Although CIPA was enacted before the internet was created, the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme. (*See e.g. In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

32. The alleged conduct Defendant constitutes an invasion of a legally protected interest that is both concrete and particularized. Violations of the right to privacy have long been actionable at common law (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019)). The right to privacy encompasses an individual's control over personal information (*Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

33. Both legislative history and statutory text indicate that Congress and the California Legislature intended to protect these historical privacy rights when enacting CIPA (Cal. Pen. Code § 630). Therefore, CIPA codifies a substantive right to privacy, the violation of which results in a concrete injury sufficient to confer standing. (*Campbell v. Facebook, Inc.*, —F.3d—, 2020 WL 1023350, at *7–8; *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020)).

34. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. (Cal. Penal Code § 637.2(a)(1)).

**The Trackers Are "Pen Registers" and/or "Trap and Trace Devices."**

35. When the Plaintiff accessed the Website—including on June 12, 2025—Plaintiff's internet browser initiated an HTTP or HTTPS request to Defendant's web server, which hosts the

content and functionality of the Website. In response, the server transmitted an HTTP response containing the necessary instructions and resources—including HTML, cascading style sheets (CSS), JavaScript files, and image assets—used by the browser to properly render and display the webpage (e.g. what text should appear, what images should be displayed, what sounds should play).




36. Hidden along with these innocuous instructions in Defendant's server response were server instructions to cause the Trackers to be installed on Plaintiff's web browser. Once installed, the Trackers initiated communications with the Third Parties for analytics, marketing, and tracking purposes.

37. The Trackers initiated client-side functions that observed Plaintiff's interactions on the Website, extracted metadata from the browser environment, and transmitted that data to external Third Party servers. The transmitted data—referred to as User Information—included identifiers such as Plaintiff's IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile Plaintiff and facilitate targeted advertising.

38. The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method—from the Plaintiff's browser to external servers controlled by the Third Parties. These requests are triggered by Plaintiff's interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

39. An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the internet, used to facilitate communication between systems. *See hiQ Labs,*

*Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used—via external geolocation services—to infer a user's general location, including state, city, and in some cases, ZIP code.

40. Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

41. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

42. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting—particularly when combined with other tracking identifiers and third-party enrichment.

43. A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

44. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

45. As alleged, the Defendant installed the Trackers on Plaintiff's browser for marketing and analytics purposes, and the Trackers collected pieces of User Information, including Plaintiff's IP address, that identifies the outgoing "routing, addressing, or signaling information" of Plaintiff. Therefore, the Trackers are each considered "pen registers" and/or "trap and trace devices."

**Defendant's Use of Pixel Trackers or Beacons and Digital Fingerprinting.**

46. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Defendant surreptitiously embedded the Trackers on Plaintiff's device which operated in the background of the browsing session and collected detailed behavioral and technical information, which was then transmitted to the Third Party servers without Plaintiff's awareness.

47. This process, known as digital fingerprinting, involves compiling various data points—such as browser version, screen resolution, installed fonts, device type, and language settings—to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

48. When combined with additional tracking mechanisms—such as cookies, login data, and third-party enrichment services—fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities.

49. A sufficiently detailed digital fingerprint—especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases—can enable the reidentification of a user.

50. The ability to associate a persistent digital profile with a specific individual—using techniques such as digital fingerprinting—has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur

deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

51. In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics—information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers embedded in the Website, which operate without user interaction or visibility.

52. The Trackers provided analytics and marketing services to Defendant using the data collected from Plaintiff and other visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

53. When Plaintiff and other users visited the Website, embedded Trackers initiated network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the users' IP address, which was automatically transmitted as part of the HTTP request header. In many cases, the Trackers' servers respond by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Trackers' scripts, new identifiers are set, and the Trackers resume collecting the user's IP address and associated behavioral data.

**Plaintiff's Data Has Financial Value.**

54. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

55. Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

56. There is "a study that values users' browsing histories at $52 per year, as well as

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

research panels that pay participants for access to their browsing histories."[3]

57. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

58. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between $1 and $30 dollars in 2009, while bank account records were valued at up to $850 dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about $55 dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity and $150 to $240 per credit card number or social security number.[5]

59. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

60. The Defendant's monetization of personal data constitutes actionable economic harm even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

---

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

**Defendant is Motivated to Monetize Consumer Information Regardless of Consent.**

61. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. As explained above, these profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

62. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through the Trackers, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on User Information—such as IP address, device type, screen resolution, and referral information—to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

63. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

64. When users' data is collected without meaningful consent and monetized, they lose

control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers—such as IP addresses, device IDs, and cookies—with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**The Trackers Function Together to Achieve Targeted Objectives.**

65. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by the Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

66. The Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

67. On information and belief, when a user visits the Website, third-party scripts and tracking pixels—including those deployed by the Trackers—are automatically executed by the user's browser without any visible indication; the Trackers immediately begin collecting behavioral data in real time, including the specific pages visited, user clicks, purchase activity, and time spent on each page; such information is then transmitted to external third-party servers without the user's knowledge or affirmative action, enabling continuous monitoring and profiling of user engagement and on-site behavior.

68. On information and belief, the Trackers collect detailed behavioral data through their embedded analytics tools and social tracking pixels, capturing engagement metrics such as clicks, time on page, and conversions, and/or monitor users' browsing behavior to deliver personalized

advertisements that reflect previously viewed products and browsing activity.

69. On information and belief, third party platforms implemented by tracking technologies participate in real-time bidding ecosystems where they evaluate user behavior and metadata collected on the Website to determine eligibility for targeted advertisements and analyze whether a given user matches advertiser-defined criteria, such as interest categories, demographics, or purchase intent.

70. On information and belief, in order to enhance the accuracy of targeted advertising, the third party tracker platforms may also rely on cookie syncing, browser fingerprinting, and identity resolution tools that link a user's behavior across multiple sessions and devices and allow advertisers to display personalized ads to users who previously visited the Website or to reach similar audiences based on behavioral profiles.

71. On information and belief, embedded tracking software exchanges and synchronizes user identifiers through backend cookie-matching techniques and server-to-server communication, allowing them to jointly maintain up-to-date user profiles; these identifiers are shared across platforms without the user's knowledge or consent, enabling persistent tracking and targeted advertising across unrelated websites and sessions; together, these entities operate as a coordinated, real-time surveillance network that monetizes users' attention, behavior, and identity at scale.

72. The Website allows users to browse its content and navigate across multiple webpages without providing consent and without being required to set or manage cookie preferences. As a result, the Trackers—including those that enable behavioral profiling and third-party data sharing—are deployed covertly and automatically without the user's awareness.

**Defendant Used the Shopify App Tracker on its Website to Obtain and Share Plaintiff's User Information Without Plaintiff's Consent.**

73. The Website installs, embeds, implements, injects, or uses the Shopify App Tracker, which is a behavioral analytics tool that monitors Plaintiff's and other users' interactions on the Website, including pageviews, session timing, and conversion events. The tracker collects interaction data used for digital marketing analysis and measuring user engagement.

74. When activated, the Shopify App Tracker executes embedded JavaScript code that initiates HTTP(S) requests from Plaintiff's and other users' browsers to Shopify Inc.-controlled

domains. These requests transmit IP addresses, browser and device metadata, session identifiers, URLs of visited pages, and timestamped records of tracked events.

75. Each transmission captures addressing, routing, and signaling information; including behavioral event metadata; without intercepting the content of Plaintiff's and other users' communications.

76. The following screenshot shows a network request to https://cdn.shopify.com/..., indicating that the Shopify App Tracker is present on the Website:




77. The Shopify App Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

78. The Shopify App Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., James v. Walt Disney Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

79. The Shopify App Tracker is a pen register because it captures outgoing signaling information initiated by Plaintiff’s and other users’ browsers; including pageview events, session identifiers, and navigation paths, which constitute “dialing, routing, addressing, or signaling information” under CIPA.

/ /

80. The Shopify App Tracker is a trap and trace device because it records incoming communication signals to Plaintiff's and other users' devices; collecting referrer headers, IP addresses, and timestamped responses to identify what Shopify Inc. content was received and when.

81. Defendant never obtained a court order permitting the installation of a pen register, trap and trace device, or process and did not obtain Plaintiff's express or implied consent.

82. Consequently, the Defendant's secret installation of the Shopify App Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**Defendant Used the Klaviyo Tracker on its Website to Obtain and Share Plaintiff's User Information Without Plaintiff's Consent.**

83. The Website installs, embeds, implements, injects, or uses the Klaviyo Tracker, which is a behavioral analytics tool that monitors Plaintiff's and other users' interactions on the Website, including pageviews, session timing, and conversion events. The tracker collects interaction data used for digital marketing analysis and measuring user engagement.

84. When activated, the Klaviyo Tracker executes embedded JavaScript code that initiates HTTP(S) requests from Plaintiff's and other users' browsers to Klaviyo, Inc.-controlled domains. These requests transmit IP addresses, browser and device metadata, session identifiers, URLs of visited pages, and timestamped records of tracked events.

85. Each transmission captures addressing, routing, and signaling information; including behavioral event metadata; without intercepting the content of Plaintiff's and other users' communications.

/ /

/ /

86. The following screenshot shows a network request to https://static.klaviyo.com/..., indicating that the Klaviyo Tracker is present on the Website:




87. The Klaviyo Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

88. The Klaviyo Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., James v. Walt Disney Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

89. The Klaviyo Tracker is a pen register because it captures outgoing signaling information initiated by Plaintiff's and other users' browsers; including pageview events, session identifiers, and navigation paths, which constitute "dialing, routing, addressing, or signaling information" under CIPA.

90. The Klaviyo Tracker is a trap and trace device because it records incoming communication signals to Plaintiff's and other users' devices; collecting referrer headers, IP addresses, and timestamped responses to identify what Klaviyo, Inc. content was received and when.

91. Defendant never obtained a court order permitting the installation of a pen register, trap and trace device, or process and did not obtain Plaintiff's express or implied consent.

92. Consequently, the Defendant's secret installation of the Klaviyo Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**FIRST CAUSE OF ACTION**

**Violation of California Invasion of Privacy Act**

**Cal. Penal Code § 638.51, *et seq.***

**By Plaintiff Against Defendant**

93. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

94. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of Website visitors.

95. Defendant did not obtain consent from Plaintiff before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.

96. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

**SECOND CAUSE OF ACTION**

**Violations of California Unauthorized Access to Computer Data Act**

**Cal. Penal Code § 502, *et seq.***

**By Plaintiff Against Defendant**

97. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

98. The California Unauthorized Access to Computer Data Act (the "CUCA") makes it unlawful for parties to obtain data from a computer user outside of the scope of the user's authorization. Specifically, Penal Code section 502(c)(1) imposes liability on any entity that, without permission, knowingly accesses and uses any computer data in order to wrongfully control or obtain money, property, or data. Penal Code section 502(c)(2) imposes liability on an entity that, without

permission, knowingly accesses and takes, copies, or makes use of any data from a computer.

99. CUCA provides a private right of action for compensatory damages, punitive damages, and attorneys' fees to any individual harmed by its violation. *See Facebook, Inc. v. Power Ventures, Inc.*, 2012 WL 542586 (N.D. Cal. Feb. 16, 2012) to which Plaintiff is entitled.

100. By knowingly installing the Trackers, Defendant violated CUCA by knowingly accessing, and without Plaintiff's permission, taking Plaintiff's computer addressing, routing and/or signaling information as described above.

**THIRD CAUSE OF ACTION**

**Violations of California's Unfair Competition Law**

**California Business & Professions Code § 17200, *et seq*.**

**By Plaintiff Against Defendant**

101. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

102. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

103. Defendant has engaged in unlawful business practices by: (a) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and (b) Violating California's Unauthorized Access to Computer Data Act § 502, et seq., including the unauthorized obtaining of computer data, including collecting, using, and/or selling Plaintiff's personal information and location data to Third Parties without providing sufficient notice. Privacy rights are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc.*, 101 F.4th 706 (9th Cir. 2025) (en banc).

104. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

105. The Defendant's practices are contrary to public policy supporting consumer privacy

and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

106. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices. On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

107. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff has suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.

108. Plaintiff's data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

109. Plaintiff seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff also seeks restitution of the value derived from the unauthorized use of Plaintiff's personal information, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## PRAYER

**WHEREFORE, Plaintiff prays for judgment against Defendant, as follows:**

1. Statutory damages as permitted by law;

2. Compensatory damages as permitted by law;

3. Preliminary and permanent injunctive relief as permitted by California's Unfair Competition Law;

4. An award of statutory minimum statutory damages of not less than $5,000 per violation pursuant to section 637.2(a)(1) of the California Penal Code;

5. For reasonable attorneys' fees, litigation expenses, and costs of suit pursuant to any available theory including, without limitation, California Penal Code section 502(e)(2), and

California Civil Code section 17200 *et seq.*;

6. For restitution pursuant to California Civil Code section 17200 *et seq.*;

7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court; and

8. Plaintiff hereby limits the total value of all relief sought by this Complaint to a maximum of $74,999.00.

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully requests a trial by jury on all appropriate issues raised in this Complaint.

Dated: August 25, 2025

**MANNING LAW, APC**

By: ______________________

Michael J. Manning Jr., Esq.
Attorney for Plaintiff

**JARRETT CHARO, APC**

By: ______________________

Jarrett S. Charo, Esq.
Attorney for Plaintiff